**IN THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY, MARYLAND**

The Reverend JOHN D. CHAPLIN *and*
REMONIA B. CHAPLIN,
9315 Hobart Street
Springdale, Maryland 20774-5413,

       *Plaintiffs,*

       v.

BANK OF AMERICA CORPORATION
100 North Tryon Street
Charlotte, North Carolina 28255

     **Serve:**  The Corporation Trust, Inc.
         351 West Camden Street
         Baltimore, MD 21201

*and*

BANK OF AMERICA, N.A.,
100 North Tryon Street
Charlotte, North Carolina 28255

     **Serve:**  The Corporation Trust, Inc.
         351 West Camden Street
         Baltimore, MD 21201

*and*

BRIAN T. MOYNIHAN
President and Chief Executive Officer
Bank of America Corporation
Bank of America, N.A.
100 North Tryon Street
Charlotte, North Carolina 28255

      **Serve:**  The Corporation Trust, Inc.
          351 West Camden Street
          Baltimore, MD 21201

CAE13- 32066

**TRIAL BY JURY DEMANDED**

PR GEO CO MD #73
2013 OCT 23  PM 4:27
Clerk of the
Circuit Court

Case: CAE13-32066
NEW CASE
APP FEE PLAIN          10.00
CV CLERK FEE-          80.00
MD LEGAL SERV          55.00
TOTAL                 145.00
Rcm# PG15      Rcpt # 38641
NMR     DCT       Blk # 933
Oct 24, 2013        02:01 PM

*and*

VANESSA LEE
Office of the President
Bank of America, N.A.
400 National Way
Simi Valley, CA 93065

       *Defendants.*

## COMPLAINT

Plaintiffs John and Remonia Chaplin (together, the "Chaplins"), by their undersigned counsel, hereby file this Complaint against Defendants Bank of America Corporation ("Bank of America"), Bank of America, N.A. ("BANA"), Brian T. Moynihan, President and CEO of Bank of America Corporation and BANA ("Moynihan"), and Vanessa Lee, acting on her own behalf and/or as agent for the "Office of the President" of Bank of America and/or BANA ("Lee"), and state as follows:

### NATURE OF ACTION

1.      This is an action for substantial damages and other relief permitted by law and equity to vindicate the rights and protect the interests of the Chaplins, and each of them, and to compensate them for the economic harm and distress that Defendants and each of them have caused the Chaplins through Defendants' unrepentant and repeated violation of federal and Maryland law in connection with a deed of trust and home mortgage loan (a) that Bank of America and/or BANA hold on the Chaplins' residence in Prince George's County, Maryland; (b)

that, in August 2011, BANA and/or Bank of America modified pursuant to President Obama's Home Affordable Modification Program ("HAMP"); and (c) that Defendants attempted since April 2013 to annul through falsehood, deception, sharp practices, and other means prohibited by Maryland law.

## PARTIES

2.      Plaintiffs Reverend John D. Chaplin and Remonia B. Chaplin are husband and wife, citizens of the State of Maryland, who own as tenants by the entireties real property and improvements located at, and commonly known as, 9315 Hobart Street, Springdale, Maryland 20774 (the "Chaplins' Home"). Reverend Chaplin is a licensed clergyman who has served the community of faith associated with the Progress for Christ Baptist Church in the District of Columbia since 1979.

3.      Defendant Bank of America is a Delaware corporation with its principal place of business in Charlotte, North Carolina. On and after July 1, 2008, by operation of law, Bank of America and BANA became successors-in-interest to Countrywide Financial Corporation ("CFC") and Countrywide Home Loans, Inc. ("CHL") (collectively referred to herein as "Countrywide"). Bank of America regularly conducts business in Maryland, and currently services, directly or indirectly through BANA, Moynihan, and/or Lee, a mortgage on the Chaplins' Home. Bank of America obtained the rights to service the mortgage as successor-in-interest to CFC and/or CHL.

3

4.     Defendant BANA is a federally chartered bank, and Bank of America's principal banking subsidiary.   On and after July 1, 2008, Bank of America and BANA became successors-in-interest to Countrywide. BANA regularly conducts business in Maryland, and currently services, directly or indirectly through Bank of America, Moynihan, and/or Lee, a mortgage on the Chaplin's Home.  BANA obtained the rights to service the mortgage as successor-in-interest to CFC and/or CHL.

## JURISDICTION AND VENUE

5.     This Court has subject-matter jurisdiction pursuant to Maryland Code, Courts & Jud. Proc. § 1-501, because the Circuit Court is the Court of original jurisdiction over all civil matters in the State of Maryland.

6.     Venue is proper in this Court pursuant to Maryland Code, Courts & Jud. Proc. § 6-201 and § 6-202, because Defendants, and each of them, carry on a regular business in Prince George's County, Maryland.

7.     This Court has personal jurisdiction over Defendants, and of them, pursuant to Maryland Code, Courts & Jud. Proc. § 6-102 and § 6-103 because, *inter alia*, Defendants contract to do business in Maryland; Defendants contract to supply services in Maryland; and Defendants, and each of them, have caused tortious injury in Maryland.  Accordingly, Defendants have sufficient contacts with the state of Maryland to satisfy the minimal requirements of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

## CONDITIONS PRECEDENT

8.     Any and all conditions precedent to bringing or marinating this action have been satisfied by the Chaplins, or have been excused or waived by Defendants, and each of them.

## FACTS

### A. THE FORECLOSURE CRISIS

9.     Over the last six years, Maryland and the United States have been in the midst of a foreclosure crisis. Recent news reports have established that one in ten American homes is at risk of foreclosure.

10.     The number of Maryland properties with foreclosure filings has increased substantially throughout the last four years.

11.     Increased foreclosures have a detrimental effect not just on the borrowers through damage to credit and reputation and the emotional strain caused by the fear of losing a unique property and the prospect of homelessness, but also on the surrounding neighborhoods that suffer decreased property values and local and state governments that lose tax revenue.

12.     Since the commencement of the crisis, revelations of massive disorganization in the servicing of residential loans, including lost paperwork, unsatisfactory customer service, and dual track loss mitigation programs where lenders were simultaneously negotiating loan modifications for borrowers and proceeding to foreclosure on those borrowers' homes have come to light.

**B. MARYLAND'S RESPONSE TO THE FORECLOSURE CRISIS**

13.    In 2007, at the beginning of the crisis, Governor O'Malley convened a task force of representatives to address the crisis that was then underway. The Maryland Homeownership Preservation Task Force produced a report which aptly summarized the devastating effect of foreclosures on the community as follows:

> Foreclosures have a devastating effect on homeowners and the communities in which they live. Frequently, a homeowner who loses his or her home to foreclosure loses the accrued equity. A property sold in a foreclosure sale typically draws a lower price than it would in a regular market sale. In the first half of 2005, Maryland's "foreclosure discount" was 18.8 percent, according the St. Ambrose Housing Aid Center, Inc. This is a tragedy for a growing number of Maryland families.

> Extensive damage is felt in neighborhoods and communities across Maryland. Research shows that with every foreclosure on a single family home, the value of homes within an eighth of a mile declines by about nine-tenths of a percent. Property tax revenues decline proportionally, causing a negative impact on state and local governments. A study of foreclosures in Chicago in 2005 estimated that a single foreclosure costs city government up to $5,000 or more.

> Foreclosures also bring with them the potential for more violent crime. Research indicates that for every single percentage point increase in the foreclosure rate in a neighborhood, violent crime in that neighborhood increases by about two percent. Foreclosures can lead to vacant or neglected properties, which create an eyesore and become targets for vandalism. This can tip a community from one dominated by homeowners to one dominated by investors. Of course, the lending industry and investors also take a hit from rising foreclosure rates. Some major lenders have closed their

doors, declared bankruptcy or shuttered their subprime lending arms as a result of the waning demand for risky mortgage products in investor markets. Lenders typically lose $50,000 or more on a single foreclosure, according to information from St. Ambrose Housing Aid Center, Inc. The banking industry cites a figure well over $60,000.

Maryland Homeownership Preservation Task Force Report at 12 (November 29, 2007) *at* http://www.gov.state.md.us/documents/HomePreservationReport.pdf.

14.     To reasonably address and avoid some of the negative consequences of foreclosure, the Task Force Report made nine general recommendations that are relevant to the issues before the Court. *See Id.* at 40-43. Included among these was a specific recommendation, which included the adoption of a good faith and fair dealing standard of care for Maryland licensed mortgage entities such as Bank of America and/or BANA. *Id.* (recommendation 7.3).

15.     In response to the expanding foreclosure crisis and the Task Force Report, the General Assembly introduced and passed several bills during the 2008 legislative session to change Maryland's foreclosure process and curb certain predatory real estate processes. These bills were passed with nearly complete bi-partisan support. As summarized in the General Assembly's 90 Day Report for the 2008 session:

> Until [2008], Maryland's foreclosure process, from the first foreclosure filing to final sale, had been among the shortest in the nation. Maryland is a quasi-judicial State, meaning that the authority for a foreclosure sale is derived from the mortgage or

deed of trust, but a court has oversight over the foreclosure sale process. Most mortgages or deeds of trust include a "power of sale" (a provision authorizing a foreclosure sale of the property after a default) or an "assent to decree" (a provision declaring an assent to the entry of an order for a foreclosure sale after a default). Under the Maryland Rules, it was not necessary to serve process or hold a hearing prior to a foreclosure sale pursuant to a power of sale or an assent to a decree. Consumer advocates contended that the short timeframes and weak notice provisions in State law seriously limited a homeowner's options to avoid foreclosure by, for example, working out a payment plan with the lender or selling the house. In addition, filing a request for an injunction to stop the sale is expensive, time consuming, and not a realistic option for most homeowners.

Senate Bill 216 (Ch. 1)/House Bill 365 (Ch. 2), emergency legislation that took effect April 4, 2008, make a number of significant changes to the foreclosure process in Maryland for residential real property. "Residential property" is defined under the Acts to mean real property improved by four or fewer single-family dwelling units. Except under specified circumstances, the Acts prohibit the filing of an action to foreclose a mortgage or deed of trust on residential property until the later of 90 days after a default in a condition on which the mortgage or deed of trust states that a sale may be made or 45 days after the notice of intent to foreclose required under the Acts is sent.

. . . .

Senate Bill 217/House Bill 360 defines "mortgage fraud" as any action by a person made with the intent to defraud that involves:

• knowingly making, using, or facilitating the use of any deliberate misstatement, misrepresentation, or omission during the mortgage lending process with the intent that it will be relied upon by a mortgage lender, borrower, or any other party to the lending process;

• receiving any proceeds or any other funds in connection with a mortgage closing that the person knows resulted from the aforementioned actions;

• conspiring to violate either of the preceding provisions; or

• filing or causing to be filed in the land records in the county where a residential real property is located any document relating to a mortgage loan that the person knows to contain a deliberate misstatement, misrepresentation, or omission.

Under the Acts, the "mortgage lending process" includes the solicitation, application, origination, negotiation, servicing, underwriting, signing, closing, and funding of a mortgage loan, as well as the notarizing of any document in connection with a mortgage loan.

Md. Dept. of Legislative Services, The 90 Day Report, A Review of the 2008 Legislative Session, F16-18 (April 11, 2008) *available at* http://mlis.state.md.us/2008rs/90-Day-report/index.htm.

C.   ENFORCEMENT ACTIONS BY THE UNITED STATES OFFICE OF THE   COMPTROLLER OF THE CURRENCY

16.     In the fourth quarter of 2010, in response to widespread allegations of deficiencies and unsafe or unsound practices in residential servicing, the Office of the Comptroller of the Currency of the United States Department of Treasury ("OCC") conducted on-site reviews of the foreclosure and loss mitigation practices of fourteen federally regulated mortgage servicers, including BANA. *See* Interagency Review of Foreclosure Policies and Practices (April 2011), at 1, *available at:* http://occ.treas.gov/news-issuances/news-releases/2011/nr-occ-2011-47a.pdf.

17.     On April 13, 2011, as a result of those reviews, the OCC announced that it had taken formal enforcement actions against eight national bank mortgage servicers and two third-party servicer providers for unsafe and unsound practices related to residential mortgage loan servicing and foreclosure processing. Bank of America was one of those servicers. *See* Press Release, OCC, OCC Takes Enforcement Action Against Eight Servicers for Unsafe and Unsound Foreclosure Practices (Apr. 13, 2011) available at: http://occ.treas.gov/news-issuances/news-releases/2011/nr-occ-2011-47.html.

18.     In resolution of the OCC enforcement action against it, Bank of America for itself and/or for BANA entered into a Consent Order with the OCC on April 13, 2011. *See* Consent Order a*vailable at:* http://occ.treas.gov/news-issuances/news-releases/2011/nr-occ-2011-47b.pdf.

19.     In the Consent Order, Bank of America and/or BANA committed to taking all necessary and appropriate steps to remedy the deficiencies and unsafe or unsound practices identified by the OCC, and to enhance the Bank's residential mortgage servicing and foreclosure processes. Consent Order at 1-2.

20.     Among the actions Bank of America for itself and/or for BANA agreed to undertake pursuant to the Consent Order:

> [Create a] compliance program to ensure that the mortgage servicing and foreclosure operations, including Loss Mitigation and loan modification, comply with all applicable Legal Requirements, OCC supervisory guidance, and the requirements of

this Order are conducted in a safe and sound manner. . . The Compliance Program shall include at a minimum:

. . .

Measures to] (i) ensure that communications are timely and effective and are designed to avoid confusion to borrowers; (ii) to ensure continuity in the handling of borrowers' loan files during the Loss Mitigation, loan modification, and foreclosure process by personnel knowledgeable about a specific borrower's situation; (iii) to ensure reasonable and good faith efforts, consistent with applicable Legal Requirements, are engaged in Loss Mitigation and foreclosure prevention for delinquent loans.

Consent Order at 7, 10, 18-19.

### D. CONSENT DECREE AGAINST BANA AND BANK OF AMERICA

21.     On or about April 4, 2012, the United States District Court for the District of Columbia entered a Consent Judgment against Bank of America for itself and for BANA in *United States v. Bank of America Corporation, et al.*, Case No. 12-cv-361-RMC ("Consent Judgment"), which is incorporated herein by reference.

22.     Pursuant to the Consent Judgment, Bank of America and BANA agreed to comply with servicing standards in connection with loan modifications, such as the HAMP loan modification agreement between the Chaplins and Bank of America and/or BANA.

23.     As alleged below, Defendants have intentionally violated the terms of the Consent Judgment as applied to the Chaplins, who are third-party beneficiaries of the Consent Judgment.

11

24.     The Consent Judgment establishes a standard for the minimal conduct of Bank of America and/or BANA in their dealings with the Chaplins.

**E. DEFENDANTS' VIOLATION OF PLAINTIFFS' RIGHTS**

25.     The Chaplins purchased the Chaplins' Home in May 1993.

26.     To make the purchase, the Chaplins borrowed money from Countrywide, which sold them a 30-year fixed mortgage insured by the Federal Housing Administration.

27.     The Chaplins made timely payment on the mortgage while it was serviced by Countrywide.

28.     In 1995, the Chaplins received notice that Bank of America or BANA had acquired the mortgage or the right to service it or both.

29.     Sometime after 1995, the Chaplins refinanced the mortgage with Bank of America and/or BANA, changing the mortgage to a 15-year fixed loan at 8% simple interest per annum, with monthly payments of $1,871.59 and a pay-off date in 2011.

30      The Chaplins made timely and complete payments on the mortgage notes held and/or serviced by Bank of America and/or BANA.

31.     In late 2009, Mrs. Chaplin became very ill and ultimately was diagnosed with end-stage renal disease.

32.     As a result of her illness, Mrs. Chaplin had to leave her job.

33.     Although the Chaplins were very close to paying off the mortgage held and/or serviced by Bank of America and/or BANA (which at the time was not more than approximately $72,000), the Chaplins did not want to take any chance of defaulting on the loan in light of the decrease in family income brought about by Mrs. Chaplin's having had to leave her job.

34.     Accordingly, in March 2010, the Chaplins completed and submitted an application to Bank of America and/or BANA for a loan modification under HAMP.

35.     In April 2010, Bank of America and/or BANA placed the Chaplins in a "3-month trial period" under HAMP.

36.     The "3-month trial period" continued through August 2011, however.

37.     During those 16 months, Bank of America and/or BANA engaged in unfair banking practices and deceptive acts to avoid modifying the mortgage on the Chaplins' Home, including without limitation:

(a)     Bank of America and/or BANA "lost" the modification application not fewer than five (5) times within different departments.

(b)     Bank of America and/or BANA provided a return address to the Chaplins that was incorrect, which caused the Chaplins' return of materials to be sent to the wrong department within either Bank of America and/or BANA. As a result, Bank of America and/or BANA issued letters of rejection on the

alleged grounds that the Chaplins had provided untimely or incomplete information. But after receiving each letter of rejection, the Chaplins submitted proof of having sent the documents on time, and the application was reopened.

(c)     Bank of America and/or BANA sent rejection or denial letters to the Chaplins, alleging that information had been received, but only after an arbitrary "deadline" established by Bank of America and/or BANA had passed. The Chaplins then faxed FEDEX receipts to Bank of America and/or BANA showing that the Chaplins had issued the documents on time, and the modification process continued.

(d)     Bank of America and/or BANA requested the same information over and over again. Their agents requested 12 months of bank statements, 5 years of tax returns, and/or random updates of information that had been sent to a different agent. Often, a newly assigned agent of Bank of America and/or BANA informed the Chaplins that, in order for the modification process to continue, the Chaplins were required to submit fresh copies of documents that the Chaplins had previously submitted or entirely new documents. Bank of America and/or BANA allowed the Chaplins only two days or fewer to submit such documents, lest Bank of America and/or BANA close the modification process and deny the Chaplins' application.

38.     During the 16-month "3-month trial period," the Chaplins concluded that Bank of America and/or BANA was attempting through

14

subterfuge to avoid having to enter into the HAMP modification, and that the Banks' prime avoidance technique was to change representatives regularly, and demand submission of new or previously-submitted documentation on an expedited basis. The Chaplins interacted with no fewer than twenty (20) different agents of Bank of America and/or BANA, each successive agent unaware of or unfamiliar with the history of the Chaplin's application process that preceded their handling of the application.

39.    On more than seven different occasions, Bank of America and/or BANA rejected the Chaplins' application on the grounds that the agents had not received "time-sensitive" information – despite the fact that, due to the repeated efforts of the Chaplins, Bank of America and/or BANA possessed the information sought.

40.    On these occasions, Reverend Chaplin was advised by a "manager" for Bank of America and/or BANA that the agent handling the Chaplins' application "was no longer with the company." This response, the Chaplins learned, meant only that the manager could not locate the information in the system (if any) used by Bank of America and/or BANA to administer HAMP. Each time, the Chaplins were directed by Bank of America and/or BANA to submit duplicate information within two days to prevent the file from closing, and the application from being denied. This technique occurred more than seven (7) times.

15

41.    After months of trying to reach a solution with Bank of America and/or BANA, the Chaplins filed complaints with Making Homes Affordable and the OCC.

42.    In response, agents of Bank of America and/or BANA identifying themselves as calling from the "Office of the President" -- Moynihan's agents -- contacted the Chaplins to engage in the same violative conduct that had corrupted and delayed the application to date: These fresh agents required updated documents; they transferred the Chaplin's application from one account manager to another, all the while assuring the Chaplins that Bank of America and/or BANA was willing to grant the Chaplins' application; and simultaneously with these assurances, Bank of America and/or BANA was sending notices to the Chaplins indicating an intent to foreclose on the loan securing the Chaplins' Home.

43.    During the 16-month "3-month trial period," the Chaplins made timely and complete payments on the mortgage note held or serviced by Bank of America and/or BANA.  The mortgage was never in default.

44.    After months of frustration, and hours of telephone negotiations, Bank of America and/or BANA finally made an offer to refinance the mortgage loan for 15 years at 8.5% annual, simple interest, with a monthly payment of approximately $1,321.41.

45.     The offer by Bank of America and/or BANA was far less favorable than the Chaplins had expected or could have negotiated in the market. But the Chaplins accepted the offer because so much time had elapsed since the Chaplins had initially applied for a modification, and because Bank of America and/or BANA presented the offer a "take it or leave it" proposition, threatening foreclosure if the Chaplins did not accept.

46.     On or about August 11, 2011, the Chaplins signed and submitted notarized documents to the Bank of America and/or BANA accepting the modified mortgage loan.

47.     The Chaplins thereafter commenced timely and complete payment of the monthly amount due on the mortgage loan held and/or serviced by Bank of America and/or BANA.

48.     After signing and delivering the loan modification to the Chaplins, however, Bank of America and/or BANA continued to violate the Chaplins' rights, including through the following techniques:

(a)     reporting the modified mortgage loan agreement as "lost," then applying payments that the Chaplins made on the modified loan to the wrong account;

(b)     harassing the Chaplins by instructing them that, even after payments on the modified loan had been verified, the Chaplins needed to send in additional documents to prevent the loan modification from being rejected; and

17

(c)     harassing the Chaplins by contacting them repeatedly through agents of Moynihan's "Office of the President" as debt collectors requesting full payment on the initial mortgage loan.

49.     For more than a year, various account managers calling from Moynihan's "Office of the President" called the Chaplins with the same requests, stating that Bank of America and/or BANA had nullified and/or voided the modified loan agreement by mistake, but refusing to explain why Bank of America and/or BANA would not honor the contract.

50.     Each month, the Chaplins dutifully paid the modified loan amount, which Bank of America and/or BANA accepted.

51.     Yet each month, Bank of America and/or BANA sent the Chaplins a monthly invoice that showed the amount due on the mortgage before the modification, without any credit whatsoever concerning either the existence of the modified mortgage or the payments that the Chaplins had made.

52.     Worse, Bank of America and/or BANA knowingly submitted incorrect information to consumer reporting agencies, directly resulting in substantial damage to the credit ratings of both Reverend Chaplin and Mrs. Chaplin.

53.     Each month, Bank of America and/or BANA account managers at Moynihan's "Office of the President" refused to explain the failure of the Bank of

America and/or BANA to send corrected invoices or their deliberate failure to issue correct or corrective information to the credit reporting agencies.

54.     Five different account managers stated the modified contract had been voided by Bank of America and/or BANA, but were not at liberty to explain why.

55.     Bank of America and/or BANA never sent the Chaplins any written notice advising the Chaplins that Bank of America and/or BANA had voided the modification agreement.

56.     In 2012, Roslyn Thompson, an account manager calling from Moynihan's "Office of the President," advised the Chaplins that she would fix the issue.  Thompson presented herself as an objective viewer.  She advised the Chaplins that she was discussing the matter with her "manager" and "the underwriters."  Discussions with Thompson delayed matters through May 2013.

57.     In May 2013, Richard Gibboney, an account manager calling from Moynihan's "Office of the President," became the new account manager for one month.

58.     In June 2013, Lee -- announcing herself as another "account manager" from Moynihan's "Office of the President" -- called Reverend Chaplin to advise that Lee was handling the Chaplins' account at Bank of America and/or BANA.

59.    Yet even after Lee announced herself as the account manager assigned to handle the Chaplins' account, Gibboney continued to call.  Gibboney and Lee each presented different narratives even though they were analyzing the same information.

60.    Lee embarked on a campaign of consumer deception and terror against the Chaplins, including:

(a)    sending or causing to be sent to the Chaplins a fresh modification application, then refusing to explain why it was necessary;

(b)    insisting that Bank of America and/or BANA had no valid loan modification on record; and

(c)    issuing documents to the Chaplins that had, by their terms, expired, and demanding that the Chaplins sign and return the documents that day, while knowing that, upon receipt, no one at Bank of America and/or BANA would review them because they had, by their terms, expired.

61.    The Chaplins pleaded with Lee to fax, email, or FEDEX a statement from Bank of America and/or BANA allowing that, if the Chaplins submitted the requested "expired" documents, Bank of America and/or BANA would nevertheless accept them and act on them.  Lee refused, without explanation.

62.    In September 2013, Lee refused to accept the Chaplin's payment on the modified loan and made a decision to remove the modification payment

20

out of the "system" for Bank of America and/or BANA. That act by Lee, which Defendants caused to be reported to the credit reporting agencies, made it appear that the Chaplins' account is in arrears at pre-modification payment level by more than $2,400 per month.

63.     The stress caused by Defendants has contributed to Mrs. Chaplin's poor health, as she has grown increasingly distraught over the possibility of losing the Chaplins' Home.

64.     On information and belief, at all times relevant to this Complaint, Lee acted for her own benefit under programs designed by Moynihan and/or Bank of America and/or BANA to reward her for not dealing with the Chaplins in good faith, in accordance with ordinary standards of fair dealing, or in accordance with standards established by the Consent Judgment.

65.     Because of the false information that Defendants have sent or allowed to be released to credit reporting agencies on the Chaplins, the Chaplins have no – zero – capacity to borrow any funds from any reputable mortgagee.

66.     Having induced the Chaplins to enter into a modification program that was unnecessary for the Chaplins, and that the Chaplins were compelled to accept as a precaution against the loss of income arising out of Mrs. Chaplin's declining health, Defendants have now cut off any means for the Chaplins to escape Bank of America and/or BANA.

67.     At all times relevant to the Complaint, Defendants acted with malice or with recklessness akin to malice.   Defendants' acts are not and cannot be attributable to mere negligence, as confirmed by the Affidavits submitted by former agents of Bank of America and/or BANA in *In re Bank of America Home Affordable Modification Program (HAMP) Contract Litigation*, MDL No. 2193, Case 1:10-MD-02193-RWZ (D. Mass).   The Chaplins incorporate and plead as if set forth in full the Affidavits of Bert Sheeks, Erika Brown, Recorda Simon, Steven Cupples, Theresa Terrelonge, and William Wilson.

## COUNT I
## VIOLATION MARYLAND'S CONSUMER PROTECTION ACT,
### Md. Code Ann., Com. Law §13-101 et seq.

68.     Plaintiffs incorporate Paragraphs 1 through 67 as if set forth fully herein.

69.     Bank of America, as the parent company of BANA, is liable as a principal for the actions of BANA and their respective agents.

70.     The mortgage loan servicing and transactions of Defendants, as set forth herein, are governed by the Consumer Protection Act, Md. Code Ann., Com. Law. § 13-101, *et. seq*.

71.     Section 13-303 prohibits unfair or deceptive trade practices in the extension of consumer credit or collection of consumer debts.   The communications sent by Defendants to the Chaplins concerning the mortgage notes issued by the Chaplins, including claiming that the Chaplins were in default

on their mortgage(s), involve both the extension of credit and the collection of debt.

72.     The Maryland Consumer Protection Act defines unfair or deceptive trade practices to include, inter alia, the following: (a) false, falsely disparaging, or misleading oral or written statement, visual description or other representation of any kind which has the capacity, tendency or effect of deceiving or misleading consumers; and (b) failure to state a material fact if the failure deceives or tends to deceive.

73.     By engaging in the acts and omissions set forth above, and by making the misrepresentations set forth above, and by failing to disclose material facts where the failure to do so deceived or tended to deceive, Defendants have committed unlawful or deceptive trade practices in violation of the Maryland Consumer Protection Act.   Sec. 13-301(1) and (3) and Sec. 13-303(4).

74.     The Defendant's conduct, as set forth above, had the capacity, tendency or effect of deceiving the Chaplins, who have suffered economic and non-economic damages (including emotional distress and mental anguish).

**WHEREFORE**, the Chaplins respectfully request that the Court issue an Order pursuant to the Maryland Consumer Protection Act:

(a)     ordering Defendants, and each of them, to compensate the Chaplins for their losses and injury in an amount to be proven at trial pursuant to Section 13-408(a) of the Act;

(b)     ordering Defendants, and each of them, to pay the Chaplins a reasonable attorneys' fee, as allowed by Section 13-408(b) of the Act; and

(c)     granting the Chaplins such further and alternative relief that the Court may deem just and proper.

## COUNT II
## VIOLATION OF THE MARYLAND CONSUMER DEBT COLLECTION ACT,
### Md. Code Ann., Com. Law. §§ 14-201, et seq.

75.     Plaintiffs incorporate Paragraphs 1-67 as if set forth fully herein.

76.     Bank of America, as the parent company of BANA, is liable as a principal for the actions of BANA and their respective agents.

77.     Defendants have attempted to collect a debt arising from a mortgage on the Chaplin's Home and are thus "collectors" within the meaning of the Maryland Consumer Debt Collection Act, Md. Code Ann., Com. Law § 14-201(b).

78.     Defendants' continued refusal to honor the modification agreement by properly applying the modified payments made by the Chaplins is a willful and knowing violation of Maryland Consumer Debt Collection Act ("Consumer Debt Collection Act").

79.     The notices sent by Defendants claiming that the Chaplins are in default of one or more agreements with Defendants represent an attempt by

Defendants to enforce a right or collect a debt which Defendants know does not exist.

80.     Defendants have disclosed information to credit reporting agencies that Defendants knew was false and that they knew would affect, and that did affect, the Chaplins' reputation for credit worthiness, to the Chaplins' detriment, all as prohibited by Section 14-202(3) of the Consumer Debt Collection Act.

81.     Defendants have communicated with the Chaplins at unusual hours and in a manner "as reasonably can be expected to abuse or harass" the Chaplins, as prohibited by Section 14-202(6) of the Consumer Debt Collection Act.

82.     Defendants have claimed, attempted, and/or threatened to enforce a right to void the loan modification agreement and/or to foreclose on the Chaplins' Home with knowledge that that right does not exist, all as prohibited by Section 14-202(8) of the Consumer Debt Collection Act.

83.     As a result of Defendant's actions, Plaintiffs have suffered economic and noneconomic damages, including emotional distress and mental anguish.

**WHEREFORE**, the Chaplins respectfully request that the Court issue an Order pursuant to the Consumer Debt Collection Act:

(a)     ordering Defendants, and each of them, to compensate the Chaplins for damages proximately caused by Defendants' violations of the Consumer Debt Collection Act, including "damages for emotional distress and/or

mental anguish suffered with or without accompanying physical injury," as allowed by Section 14-203 of the Consumer Debt Protection Act, in an amount to be proven at trial;

(b)     ordering Defendants, and each of them, to pay the Chaplins a reasonable attorneys' fee, as allowed by Section 14-203 of the Consumer Debt Collection Act; and

(c)     granting the Chaplins such further and alternative relief that the Court may deem just and proper.

## COUNT III
### VIOLATION OF THE MARYLAND MORTGAGE FRAUD ACT,
### Md. Code Ann., Real Prop. §§ 7-401, et seq.

84.     Plaintiffs incorporate paragraphs 1-67 as if set forth fully herein.

85.     Bank of America, as the parent company of BANA, is liable as a principal for the actions of BANA and their respective agents.

86.     The Maryland Mortgage Fraud Protection Act, Md. Code Ann., Real Prop. § 7-401, *et. seq.* ("MMFPA"), governs the relationship between Defendants and the Chaplins.

87.     MMFPA, Md. Code Ann., Real Prop. § 7-401(c), provides: "'Homeowner'" means a record owner of residential real property." The Chaplins are record owners of the Property, and are therefore "homeowners" within the meaning of the MMFPA.

88.    MMFPA, Md. Code Ann., Real Prop. § 7-401(e), provides: "'Mortgage lending process' . . . include[s] [t]he... servicing... of a mortgage loan."

89.    MMFPA, Md. Ann. Code, Fin. Inst. § 11-501(l), provides: "'Mortgage loan' means any loan or other extension of credit that is: (i) secured, in whole or in part, by any interest in residential real property in Maryland; and (ii) for personal household or family purposes, in any amount."

90.    The MMFPA works to protect the interests of all parties to mortgage transactions in Maryland from misstatements, misrepresentations, and omissions. In this instance, the MMFPA works to protect borrowers like the Chaplins from Defendants, and to and ensure a level, fair playing field between all borrowers and professional mortgage servicers.

91.    The Chaplins are homeowners in the "Mortgage Lending Process" as defined by the MMFPA because the actions in dispute in this lawsuit involve the servicing of their residential mortgage loans and the attempts to collect a non-existent alleged "past-due" arrearage.

92.    MMFPA, Md. Code Ann., Real Prop. § 7-401(d) provides:

"Mortgage fraud" means any action by a person made with the intent to defraud that involves:

1.    Knowingly   making   any   deliberate   misstatement, misrepresentation or omission during the mortgage lending process with the intent that the misstatement, misrepresentation or

omission be relied on by a mortgage lender, borrower or any other party to the mortgage lending process;

2. Knowingly using or facilitating the use of any deliberate misstatement, misrepresentation, or omission during the mortgage lending process with the intent that the misstatement, misrepresentation, or omission be relied on by a mortgage lender, borrower, or any other party to the mortgage lending process.

3. Receiving any proceeds or any other funds in connection with a mortgage closing that the person knows resulted from a violation of item (1) or (2) of this section;

4. Conspiring to violate any provisions of item (1), (2), or (3) of this section…

93    Defendants have committed Mortgage Fraud by knowingly making, as described herein, deliberate misstatements, misrepresentations, and omissions during the mortgage lending process, with the intent that the misstatements, misrepresentations, and omissions be relied on by the Chaplins, including without limitation in the following manner:

(a)    Defendants knowingly sent Plaintiffs notices that Plaintiffs' mortgage was in default despite the fact that Plaintiffs have made all required payments under their loan modification agreement; and

(b)    Defendants knowingly harassed the Chaplins by refusing to explain the need, if any, for the Chaplins to complete a new HAMP application after their initial modification had been approved by Defendants.

94.   As a result of Defendant's knowingly deceptive and untrue communications, Plaintiffs have suffered economic and noneconomic damages, and incurred court costs and attorneys' fees.

**WHEREFORE,** the Chaplins respectfully request that the Court issue an Order pursuant to the MMFPA:

(a)   ordering Defendants to compensate the Chaplins for their actual damages in an amount to be proven at trial;

(b)   ordering Defendants to pay the Chaplins treble damages for Defendants' willful and knowing violations of the MMFPA, pursuant to Md. Code Ann., Real Prop. § 7-406(c),

(c)   ordering Defendants to pay the Chaplins' costs and attorneys' fees; and

(d)   granting the Chaplins such further and alternative relief that the Court deems just and proper.

## COUNT IV
## DECLARATORY AND INJUNCTIVE RELIEF

95.   Plaintiffs incorporate paragraphs 1-67 as if set forth fully herein.

96.   Bank of America, as the parent company of BANA, is liable as a principal for the actions of BANA and their respective agents.

97.     Plaintiffs seek a declaration of their rights with respect to the status

of their mortgage modification and their accounts with Bank of America and/or

BANA.

98.     An actual controversy exists as to the true amount owed by the

Chaplins to Bank of America and/or BANA, and the correct amount of their

monthly payments under the terms of the modified mortgage agreement.

99.     Declaratory relief is appropriate pursuant to Md. Code Ann. and

Cts. & Jud. Pro. §§ 3-401 to 3-415.

100.    The Chaplins are entitled to an order enjoining Defendants, and

each of them, from continued violations of the Chaplins' rights, because the

actions of Defendants are improper and illegal, and in violation of the Consent

Judgment.

101.    The public interest is served by enjoining Defendants from

continuing to violate Maryland law.

102.    Plaintiffs will suffer irreparable harm if Defendants are not

enjoined from continued unlawful conduct or from engaging in ostensible lawful

conduct to enjoy the fruit of their prior unlawful conduct.

103.    The burden imposed on Defendants by requiring them to comply

with Maryland laws and regulations concerning the servicing of mortgage loans is

substantially outweighed by the harm that has been suffered and that will be

suffered by the Chaplins if Defendants are permitted to ignore the requirements of Maryland law.

**WHEREFORE,** Plaintiffs respectfully request that the Court declare the rights of the Chaplins as against Defendants; order appropriate injunctive relief to rectify past violations of law and prevent further violations of law, including a temporary restraining order, preliminary and/or permanent injunctions on any attempts to collect the arrearages Defendants falsely claim they are owed through foreclosure proceedings or other processes; and order other appropriate declaratory relief.

### JURY DEMAND

The Chaplins demand a trial by jury of all issues triable by a jury.

Dated: October 23, 2013
Washington, D.C.

Respectfully Submitted,

**REZVANI VOLIN & ROTBERT P.C.**

By: _____
Mitchell J. Rotbert
1050 Connecticut Avenue, N.W. Tenth Floor
Washington, D.C. 20036
Phone:  (202) 350-4270 x103
Mobile: (240) 600-6467
Fax: (202) 351-0544
mrotbert@rvrlegal.com

*Counsel for Plaintiffs*